TIMOTHY J. ENGEL, Respondent-Petitioner-Appellant.
v.
ADMINISTRATIVE DIRECTOR OF THE COURTS, STATE OF HAWAI`I, Respondent-Appellee.
No. 26852.
Supreme Court of Hawaii.
March 28, 2007.
On the briefs:
Earle A. Partington, for the respondent-petitioner-appellant, Timothy J. Engel.
Girard D. Lau, Deputy Attorney General, for the respondent-appellee Administrative Director of the Courts, State of Hawai`i.

SUMMARY DISPOSITION ORDER
MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J., concurring and dissenting separately
The respondent-petitioner-appellant Timothy J. Engel appeals from the August 30, 2004 judgment of the district court of the first circuit, Honolulu Division, the Honorable William A. Cardwell presiding, affirming the Administrative Driver's License Revocation Office's (ADLRO) three-month revocation of his driver's license.
On appeal, Engel contends that the district court erred in affirming the hearing officer's decision inasmuch as: (1) notwithstanding the similarity of Freitas v. Admin. Dir. of the Courts, 104 Hawai`i 483, 92 P.3d 993 (2004) [hereinafter, "Freitas I"], Engel was entitled "to his own hearing on the ADLRO access restrictions and . . . to a public hearing" on the merits of the administrative revocation; (2) "the lack of a uniform common procedure" in ADLRO hearings deprived Engel of "due process of law . . . [and] violated the mandate of [HRS ch.] 291E, [pt.] III" (Supp. 2003); (3) the field sobriety test (FST) results were inadmissible inasmuch as they "were [(a)] administered shortly after Engel had been involved in a major accident" and (b) "not . . . in accordance with [National Highway Traffic Safety Administration (NHTSA)] requirements"; (4) the Intoxilyzer supervisor's sworn statement was inadmissible inasmuch as it does not "establish[] that the Intoxilyzer used in this case had been properly maintained"; (5) before consenting to the breath test, "Engel was never told that [(a)] he had a legal right to refuse," (b) the ADLRO would have to find "reasonable suspicion to stop" and "probable cause to believe [the] respondent [operated a vehicle under the influence of an intoxicant (OVUII)]" as well as actual intoxication, and (c) the revocation of Engel's driving privilege would extend to mopeds and vessels; and (6) the Notice of Administrative Revocation (NoAR) did not explain the difference between administrative revocation and criminal suspension. (Emphases in original.) (Citations omitted.)
Upon carefully reviewing the record and the briefs and having given due consideration to the arguments advanced and the issues raised, we affirm the district court's August 30, 2004 judgment for the following reasons:
(1) In Freitas I, as in the present matter, the respondent Darcy C.K. Freitas alleged that, "[j]ust before the hearing . . . , a woman entered the ADLRO office and asked to attend [the] hearing. The receptionist told the woman that the woman would have to show identification and sign in or she would not be permitted to attend the hearing. The woman refused to either identify herself or sign in and, thus, was refused entry." 104 Hawai`i at 484, 92 P.3d at 994. After temporarily remanding to afford Freitas a hearing before the ADLRO, we
h[e]ld (1) that the ADLRO's identification and sign-in procedure serves an important government interest in securing ADLRO hearings, (2) that the security procedure is unrelated to the content of the information disclosed at ADLRO hearings, and (3) that there is no less restrictive way to meet the goal of securing ADLRO hearings. As such, . . . the ADLRO's identification and sign-in procedure does not impermissibly infringe upon Freitas's constitutional right to a public hearing.
See Freitas v. Admin. Dir. of the Courts, 108 Hawai`i 31, 33, 40, 116 P.3d 673, 675, 682 (2005) [hereinafter, "Freitas II"]. Both Engel and the ADLRO hearing officer effectively acknowledged in the July 12, 2004 hearing that the sign-in procedure imposed upon the unidentified woman in the present matter is the same as that validated by the ADLRO and this court in Freitas II.[1] We see no reason to waste time retreading Freitas II, either theoretically or by granting Engel his own hearing on the same issue. See Minnich v. Admin. Dir. of Courts, 109 Hawai`i 220, 227, 124 P.3d 965, 972 (2005); Dunaway v. Admin. Dir. of Courts, 108 Hawai`i 78, 83, 117 P.3d 109, 114 (2005).
(2) Regarding Engel's objection to the ADLRO's hearing procedure, we struggle to pinpoint the defect and its purported harm. In his concise statement of points of error, Engel does not allege any prejudicial consequences of the ADLRO's procedure. Eventually, in his argument section, he implies that the ADLRO erred in admitting Officer Robert Cavaco's April 24, 2004 arrest report into evidence, but the means by which Engel's own six-step procedure would have ameliorated the supposedly incorrect admission of evidence eludes us. He implies that this court should draw a negative inference from the legislature's failure to enumerate "arrest reports" as a type of admissible evidence, but nowhere does he explain how his own procedural steps would preclude consideration of Officer Cavaco's arrest report.[2]
In any case, we disagree with Engel's self-serving reading of HRS § 291E-38. HRS § 291E-38(d)(3) at least implies that the hearing officer has discretion to "receive" evidence and determine its weight. Accord Desmond v. Admin. Dir. of the Courts, 91 Hawai`i 212, 218, 220, 982 P.2d 346, 352, 354 (App. 1998) (construing prior law) ("`[T]he technical rules of evidence applicable to judicial proceedings generally do not govern agency proceedings, and need not be observed so long as evidentiary rules which are applied are not applied in an arbitrary or oppressive manner that deprives a party of his or her right to a fair hearing.'") (quoting 2 Am. Jur. 2d Administrative Law § 345 (1994)), rev'd on other grounds, 90 Hawai`i 301, 302, 978 P.2d 739, 740 (1999). Moreover, subsections (g) and (h) do not purport to be an affirmative enumeration of admissible evidence or to exclude evidence outside their purview. Even Engel's argument seems to concede that, if its "evidentiary value" so warrants, the hearing officer is empowered to admit an arrest report. See also Dunaway, 108 Hawai`i at 84, 117 P.3d at 115 (where appellant "made no showing that . . . the arrest report w[as] irrelevant or prejudicial," holding that, "while the hearing officer is not required by statute to admit the arrest report, she did not reversibly err when she did so"); Freitas II, 108 Hawai`i at 46 n.19, 116 P.3d at 688 n.19 ("HRS § 291E-38 does not prohibit the admission of a police report . . . . Moreover, the fact that HRS § 291E-3[8](h) refers only to sworn statements . . . and not police reports[ ] does not necessarily indicate a legislative intent to [exclude] police reports . . . , assuming their relevance and non-prejudicial nature.").
(3) (a) We are unpersuaded by Engel's argument that the accident rendered the ensuing FSTs utterly inadmissible. Aside from the vast prosecutorial obstacles that would spring from a rule excluding all post-accident FSTs, such a rigid holding would (i) incorrectly divest the hearing officer of her or his authority to "[r]eceive and determine the relevance of evidence," see HRS § 291E-38(d)(3), and (ii) ignore Minnich, in which we rejected the driver's argument that his FST results were inadmissible, inter alia, because he "had been involved in a major car accident," 109 Hawai`i at 226, 124 P.3d at 971.[3]
(b) At least with respect to the walk-and-turn test, the NHTSA manual directs that officers' field notes may document "conditions that may interfere with suspect's performance" alongside other factors indicating intoxication. Appending such qualifiers would obviously be unnecessary if any such "condition[ ]" obliterated the test report's admissibility altogether.
Admittedly, the Intermediate Court of Appeals (ICA), in State v. Ito, 90 Hawai`i 225, 978 P.2d 191 (App. 1999), categorically rejected the district court's finding of probable cause inasmuch as (i) the language of the NHTSA manual disavowed the FSTs' validity when the tests deviate from "standardized . . . elements," and (ii) the investigating officer admitted that the horizontal gaze nystagmus test (HGN) "may have been `incomplete.'" See id. at 244-45, 978 P.2d at 210-11 (emphasis omitted). Nevertheless, in the present matter, it is undisputed that Officer Timothy Tenney held the HGN stylus "approximately 18 inches in front of [Engel's] face" and that he used some form of line for the walk-and-turn test, if only a naturally occurring one. The hearing officer was satisfied (i) that eighteen inches from Engel's face "approximate[d]" twelve to fifteen inches from his nose, and (ii) that Engel's loss of balance would have occurred even with an "actual" line, whatever that is. Moreover, Engel reads the NHTSA manual incompletely and inaccurately. The NHTSA manual admits "that the [ ]FSTs will not always be administered under ideal conditions," but notes that, "[e]ven when administered under less than ideal conditions, they will generally serve as valid and useful indicators of impairment. Slight variations from the ideal . . . may have some [e]ffect on the evidentiary weight given to the results. However, this does not necessarily make the []FSTs invalid." In regards to the walk-and-turn test, the parties overlook the manual's express comment that the line used can be "real or imaginary," although it must be "a designated straight line."
(4) (a) We disagree with Engel's assertion that Kevin Bailey's April 21, 2004 sworn statement did not "establish[ ] that the Intoxilyzer . . . had been properly maintained" (emphasis in original), a precondition to admissibility under HRS § 291E-36(a)(2)(C). In Park v. Tanaka, 75 Haw. 271, 279, 859 P.2d 917, 921 (1993), the ICA held that "the statement that `[t]he Intoxilyzer used ha[s] been in proper working order when the test was conducted' presupposes that the supervisor tested the machine and that it was working properly, thus fulfilling the requirement of HRS § 286-257(a)(2)(C)" (now HRS § 291E-36(a)(2)(C)). Id. at 278-79, 859 P.2d at 921 (emphasis added) (brackets in original); see also Miller v. Tanaka, 80 Hawai`i 358, 369, 910 P.2d 129, 140 (App. 1995). The same can be said for Bailey's statement that "[t]he Intoxilyzer was operating accurately in compliance with [HAR] § 11-114-7" (emphasis added), which requires monthly accuracy verification irrespective of whether the Intoxilyzer's use on an actual suspect is imminent.
(b) Next, in his argument section, Engel urges that Castro v. Admin. Dir of the Courts, 97 Hawai`i 463, 40 P.3d 865 (2002), was wrongly decided and "makes a mockery of State v. Wilson, 92 Hawai`i 45, 987 P.2d 268 (1999), and its progeny," inasmuch as "a valid chemical test or refusal [is] a . . . prerequisite to ADLRO jurisdiction." In the present context, Engel's argument can only mean that the Intoxilyzer supervisor's failure to use a form of the word "maintenance" in his April 21, 2004 statement stripped the ADLRO of jurisdiction altogether.
Ironically, Engel fails to even hint at this argument in his concise statement of the points of error as required by Hawai`i Rules of Appellate Procedure (HRAP) Rule 28(b)(4), compelling us to "disregard[ ]" it. In any case, Dunaway and Freitas II squarely rejected this argument, holding "that a valid test result over 0.08 or a refusal to take a chemical test is not a jurisdictional prerequisite for a[n] . . . administrative license [revocation] hearing." Dunaway, 108 Hawai`i at 84, 117 P.3d at 115 (quoting Freitas II, 108 Hawai`i at 46, 116 P.3d at 688).
(5) (a) In Dunaway, we held that the HPD-396B need not expressly inform respondents that they may refuse to be tested. See 108 Hawai`i at 80, 85 & n.12, 86-87, 117 P.3d at 111, 116 & n.12, 117-18. "[T]he [HPD-396B] . . . adequately convey[s] that refusal [i]s the alternative and, thus, the opposing option to consenting to a test." Id. at 85, 117 P.3d at 116. In the present matter, the HPD-396B contained the same language as that discussed in Dunaway. Consequently, we hold that Engel was fully apprised of his options and the associated consequences.
(b) Engel appears to argue that the HPD-396B should have alerted him that revocation would require not only a "failed" breath test or a refusal but also reasonable suspicion and probable cause. In Dunaway, we confronted this same argument and soundly rejected it. The "HPD[-]396B need not notify drivers that the police must establish reasonable suspicion to stop and probable cause to believe a driver is O[V]UI[I] in an administrative license revocation hearing, in the absence of a statutory directive to that effect." Id. at 86, 117 P.3d at 117. In the present matter, Engel plainly fails to identify such "a statutory directive."
(c) Dunaway also argued, as does Engel, that he was not made aware that a "moped" or a "vessel" could be considered a "vehicle" for administrative revocation purposes. We were unpersuaded:
Under HRS § 291E-1, "a `vehicle' includes a motor vehicle, moped, and a vessel." "Vehicle" is defined as a "means of carrying or transporting something." Webster's Tenth Collegiate Dictionary 1309 (1993). We believe the term "vehicle" is a term of ordinary usage and is broad enough to inform a person of ordinary intelligence that it would include a means of ground transportation such as a moped. Therefore, Dunaway's claim that he was unaware that a moped was a vehicle must fail.
[The] HPD[-]396B also puts Dunaway on notice that the term "vehicle" includes a "vessel." . . . [T]he form stated that the term vehicle also refers to "a vehicle . . . in the waters of the State." This is consistent with HRS § 291E-1, which states that "a `vessel' means all description of watercraft that are used and are capable of being used as a means of transportation on or in the water." Hence, the HPD[-]396B['s] references to "a vehicle . . . in the waters" . . . would refer to a means of transportation employed in the water. Therefore, Dunaway was not erroneously informed as to the word "vehicle."
Dunaway, 108 Hawai`i at 86-87, 117 P.3d at 117-18 (footnotes omitted) (some brackets and ellipses added and some in original).
(6) The NoAR patently distinguishes between an administrative revocation and a criminal OVUII proceeding. It explains, under the heading "CRIMINAL PROSECUTION" (emphasis in original), that "[t]he administrative revocation process is a civil administrative proceeding that is separate and distinct from criminal prosecution. Criminal charges filed pursuant to HRS §[ ]291E-61 may be prosecuted concurrently with the administrative proceeding." We previously recognized the vacancy of the assertion "that [the] HPD[-]396B does not adequately explain the distinction between administrative revocation and criminal suspension," in the case of Dunaway, who was represented by the same counsel as Engel. See Dunaway, 108 Hawai`i at 80, 82, 87, 117 P.3d at 111, 113, 118. We find this argument to be "so manifestly and palpably without merit as to indicate bad faith on the pleader's part such that argument to the court was not required," see, e.g., Child Support Enf. Agency v. Doe, 109 Hawai`i 240, 253, 125 P.3d 461, 474 (2005) (quoting Rhoads v. Okamura, 98 Hawai`i 407, 414, 49 P.3d 373, 380 (2002)), and, were it not for the fact that Dunaway was filed after Engel's briefs, we would consider this point of error "frivolous" so as to warrant notice under HRAP Rule 38. We hope that Dunaway has done away with this baseless challenge. Therefore,
IT IS HEREBY ORDERED that the judgment from which the appeal is taken is affirmed.
CONCURRING AND DISSENTING OPINION BY ACOBA, J.
I dissent as to affirmation of the sign-in procedure in Freitas v. Admin. Dir. Of the Courts, 108 Hawai`i 31, 116 P.3d 673 (2005), and concur as to the ultimate result herein.
NOTES
[1] . . . Freitas [I] noted that there is a right to have a hearing on the so-called security procedures here.
. . . .
HEARING OFFICER: . . . I am aware of the Supreme Court ruling in Freitas [I]. I am also aware that the matter was remanded . . . .
. . . [I]t would be crazy to have a hearing on that matter because . . . you're going to have a hearing soon on that matter. I think perhaps that hearing will take care of the matter or will satisfy what the Supreme Court said.
. . . .
. . . [I]n the interest of not being repetitive . . . we should wait until [Freitas I] is resolved because that will resolve the matter. I don't think it makes sense to have a hearing in every case . . . on the same issue . . . .
(Emphases added.)
[2] We might infer from Engel's underlining of "competent" in his steps one and four that he does not believe the arrest report to be "competent," but this strikes us as a somewhat substantive question, not only procedural.
[3] In Minnich, we reasoned that the driver's comment to the investigating officer "that he was not[ injured] and that he was fine . . . foreclose[d] [his] suggestions that the accident had an effect on the SFSTs." 109 Hawai`i at 228, 124 P.3d at 973. In the present matter, while Engel did not affirmatively state that he was unstirred by the accident, both Officers Timothy Tenney and Neal Ah Yat reported that "Engel did not complain of any injuries nor were any seen."